UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Barbara Kraft**

    **v.**                      Case No. 10-cv-164-PB
                                      Opinion No. 2012 DNH 018

**Larry A. Mayer**
**University of New Hampshire**


MEMORANDUM AND ORDER

Barbara Kraft, a former Assistant Research Professor in Ocean Engineering at the University of New Hampshire ("UNH"), filed suit in New Hampshire Superior Court against UNH and Larry Mayer, Director of the Center for Coastal & Ocean Mapping ("CCOM"). She asserted state law claims for wrongful termination, breach of contract, intentional interference with contractual relations, and intentional infliction of emotional distress. She also asserted a federal law claim under 42 U.S.C. § 1983, alleging a substantive due process violation. Based on federal question jurisdiction over Kraft's Section 1983 claim, defendants removed the action to this court. Defendants now move for summary judgment on all claims. For the reasons provided below, I grant the motion with respect to Kraft's

Section 1983 claim and decline to exercise supplemental jurisdiction over her state law claims.

## I.  BACKGROUND

Kraft began working at CCOM in June 2001 as a post-doctoral fellow.  In March 2004, she was promoted to Research Scientist II, a position funded through a grant awarded to UNH by the National Oceanic and Atmospheric Administration ("NOAA").  Kraft was named in CCOM's grant proposal submitted to NOAA in January 2005.  NOAA approved CCOM's funding through December 2010.

In February 2006, Kraft was promoted to the position of Assistant Research Professor in Ocean Engineering.  Her letter of appointment, dated March 7, 2007, stated that her salary was to be covered by the CCOM operating budget through grants from NOAA, the Office of Naval Research ("ONR"), or other sources.  Doc. No. 4 at 30.  The letter also provided that Kraft would "be responsible for conducting research and producing results consistent with the tasks outlined in the grants from which your support is drawn."  Id.  Lastly, the letter provided that "[a]fter a period of no longer than 6 years from your appointment, February 2006, you will be evaluated for promotion

2

to the rank of Associate Research Professor." <u>Id.</u>  Kraft subsequently received a salary increase based on her performance.

In October 2007, Kraft filed a complaint under UNH's Misconduct in Scholarly Activity ("MISA") policy against Mayer, who, as the Director of CCOM, was Kraft's supervisor, and Luciano Fonseca, then an Assistant Research Professor at CCOM.[1] She alleged that Mayer and Fonseca had misappropriated and published her data without her knowledge or consent.  An inquiry team investigated the complaint.  In December 2007, the team concluded that the alleged actions did not rise to the level of scholarly misconduct.  The team noted, however, that problems with collegiality between some personnel at CCOM, namely Kraft and Fonseca, were sufficiently serious to warrant further mediation or other recourse.  The team also recommended that CCOM establish clear authorship criteria.

---

[1] Kraft and Fonseca had a previous dispute that started in December 2003, after Kraft and another colleague informed Fonseca that they had uncovered a few errors in his work.  The dispute led to years of tense relations between the two, which Kraft insinuates were caused by Fonseca's inability to interact with women.  Mayer sought to resolve the conflict by appointing a mediator, but mediation proved unsuccessful.  Shortly after the failed mediation, Mayer and Fonseca submitted for publication the article that was the subject of Kraft's MISA complaint.

In January 2008, approximately two weeks after the completion of the MISA inquiry, Mayer told Christian de Moustier, then a tenured Professor at CCOM, "that he wanted to fire Kraft." De Moustier Aff., Doc. No. 26-79, at 7. After Mayer repeated his intention to fire Kraft at a meeting de Moustier attended, de Moustier "warned Kraft to keep a low profile because Mayer was looking for reasons to fire her." Id.

Kraft sensed Mayer's hostility towards her at around the same time. In January, she received a "caustic" email from him expressing his disapproval of her criticism of a CCOM graduate student. Kraft perceived the email as uncharacteristic of Mayer, because he did not ask for her side of the story and proceeded to seek the Dean's advice on how to manage the minor conflict. She believed that Mayer was working to document any reason to terminate her in retaliation for the MISA complaint. Over the next nine months, she reported to several UNH administrators that Mayer wanted to terminate her.

Mayer avoided speaking to Kraft until April 2008, when he came into her office. In response to her remark that it had been a long time since she had seen him, Mayer said, "I haven't spoken to you because I've been mad at you." Doc. No. 24-5 at

4

481.  Kraft concedes that he possibly added, "but I'm not mad
anymore."  <u>Id.</u>

Subsequently, Kraft met with Donna Marie Sorrentino,
Director of the UNH Affirmative Action and Equity Office, to
express concerns about a hostile work environment.  She
discussed her concern regarding Mayer's remark that he wished to
terminate her, Fonseca's ongoing abusive and discriminatory
behavior, and the University's lack of response in addressing
the MISA inquiry team's recommendations.  Sorrentino initiated a
Discrimination and Harassment Complaint/Incident Report and met
with Joseph Klewicki, Dean of the College of Engineering and
Physical Sciences, to discuss Kraft's concerns.  Dean Klewicki
recommended following up with Vice Provost Taylor Eighmy.
Sorrentino relayed the message to Kraft.  Kraft had previously
met with Eighmy to discuss results of the MISA inquiry and found
the meeting unproductive and stressful.  As a result, she did
not follow up with him this time.

In May 2008, after the academic year ended, Kraft left her
office at CCOM and began working in de Moustier's lab in
Kingsbury Hall.  She did so in an effort to remove herself from
the hostile work environment.  Since she would not receive

compensation from CCOM during the summer months, she did not think it was incumbent upon her to inform Mayer or anyone else at CCOM of her decision.

When the new academic year began in September, Kraft negotiated an alternative work arrangement agreement with Mayer. Tracy Birmingham facilitated the negotiations.[2]  The agreement, dated September 30, 2008, provided that Kraft would continue her appointment as a CCOM Assistant Research Professor for the fall 2008 term.  Doc. No. 24-10.  The agreement required Kraft to complete three papers and submit them for publication by the end of 2008.  Id.  She could continue to work from Kingsbury Hall or another on-campus location outside of CCOM during the term.  Id. Lastly, the agreement noted that Kraft had advised that she would seek other professional opportunities at the end of 2008.[3] Id.

---

[2] When Birmingham contacted Kraft in September to discuss Kraft's affiliation with CCOM, she identified herself as the Interim Contract Administrator at UNH.  She did not disclose to Kraft that she was also UNH Special Counsel.

[3] Defendants claim that the agreement set out the terms of Kraft's re-appointment as Assistant Research Professor. According to defendants, UNH policies provide that non-tenured faculty members are re-appointed annually.  Kraft contends that she understood the agreement solely to pertain to her off-site

In November 2008, Birmingham followed up with Kraft about her work arrangement.  At the same time, she informed Vice Provost Eighmy of her belief that it would be best if Kraft left CCOM for another job.  She added, "I also think we might minimize our risk exposure with [Kraft] with some relatively easy efforts to show our concern for her future prospects."  Doc. No. 26-51 at 38.  Kraft contends that the ambiguous reference to "risk exposure" regarded her charge that Mayer was seeking to retaliate against her for the MISA complaint.

In December 2008, Kraft sent a progress report to Mayer detailing her work during the fall term.  Regarding the three papers that the September agreement required Kraft to complete and submit for publication by the end of 2008, she had completed the first, had begun working on the second, and had not started the third.

In January 2009, Kraft contacted Birmingham about her work arrangement for the spring term.  Birmingham offered to facilitate another agreement between Kraft and Mayer.  After reviewing a proposed agreement outlining expectations for the spring term, Kraft informed Birmingham that she was "extremely

---

work arrangement.  She never received re-appointment letters and, to her knowledge, neither did any of her CCOM colleagues.

uncomfortable signing a letter of agreement that does not address the fundamental issues raised in my MISA complaint and that continues to punish me for having filed such a complaint." Doc. No. 26-52. As a result, Birmingham informed Kraft that she was not required to sign the letter of agreement. The letter, which Kraft received in March 2009, provided that Kraft would continue her appointment as a CCOM Assistant Research Professor for the spring 2009 term while working in Kingsbury Hall. Doc. No. 24-13. It also stated that during the spring term, Kraft would complete the work outlined in the September agreement. Id. Lastly, the letter informed Kraft that "continued failure to meet the expectations set forth in our agreements may have consequences up to and including non-renewal." Id.

On March 31, 2009, Kraft sent to Mayer a detailed update of the research she had completed to date during the spring term. She received an email from Mayer acknowledging receipt of her progress report but providing no feedback. In response, Kraft emailed Birmingham to inform her that she had never received a performance evaluation in her eight years at CCOM nor had she received any feedback on the progress reports she had submitted to Mayer. She added, "I am left to assume that my research is

8

satisfactorily meeting expectations.  If this is not the case, then the CCOM Director needs to communicate that to me." Doc. No. 26-55.

On April 29, Kraft informed Mayer and Birmingham of her desire to continue working from her remote location during the fall 2009 term.  In June, she provided another summary of her work progress during the spring term and asked Mayer to inform her if he needed any additional information.  She had yet to complete the two remaining papers required under the September 2008 and March 2009 agreements.

On or about July 20, 2009, Kraft received a letter from Mayer stating that CCOM could not continue to fund her work beyond October 22, 2009.  Doc. No. 24-15.  A few days later, she received a letter from Dean Klewicki informing her that in the absence of CCOM funding, she would need to seek external funding to maintain her appointment as Assistant Research Professor. Doc. No. 24-17.  The letter also stated that Kraft could extend her appointment through October 2010 by taking an unpaid leave of absence until she was able to secure external funding.  Id. If she chose not to take the leave, her appointment would terminate effective October 20, 2009.  Id.

In response to Kraft's request for clarification of the reasons for her termination, Mayer wrote her a letter dated September 4, 2009.  In pertinent part, the letter stated that Kraft had completed only one of the three papers required by the September 2008 and March 2009 agreements, and that she had not identified any NOAA-related research projects that she intended to pursue.  Doc. No. 24-16.  Based on her progress reports, neither Mayer nor the NOAA program manager "found any indication of any effort that could justify support from our NOAA contract."  Id.  As a result, CCOM could not support Kraft further.  Kraft was shocked to read Mayer's allegation that her work was not relevant to the NOAA grant because he had never previously informed her that her research was inconsistent with the tasks outlined in the grant.  She believed that the research she was pursuing was entirely consistent with the terms of the grant.

In response to further inquiries from Kraft, Birmingham informed her that Mayer had decided to discontinue her funding "because of your failure to perform the requisite work," and that in the absence of funding, Kraft could not be re-appointed.  Doc. No. 24-18.  Birmingham concluded by stating that "while

10

poor performance was implicated in the decision to discontinue your CCOM funding, your termination was by policy a 'Termination Due to Lack of Funding/Appointment Limitation.'" <u>Id.</u>

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.  <u>See</u> Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); <u>see</u> Celotex, 477 U.S. at 323.

11

### III.   <u>ANALYSIS</u>

Kraft asserts a number of claims in connection with her employment termination, including a Section 1983 claim and four state law claims.   Defendants move for summary judgment on all claims.

**A.   Kraft's Section 1983 Claim**

Kraft asserts a claim for damages pursuant to 42 U.S.C. § 1983, alleging that defendants unlawfully deprived her of protected liberty interests in her good name and reputation. Defendants argue that their actions in terminating Kraft did not violate Kraft's liberty interests.

Section 1983 provides a remedy for violations of federal rights elsewhere conferred.   Albright v. Oliver, 510 U.S. 266, 271 (1994); <u>see</u> 42 U.S.C. § 1983.   The basis for Kraft's Section 1983 claim is the Fourteenth Amendment's Due Process Clause, which prohibits a state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.   In addition to guaranteeing procedural fairness, the Due Process Clause "cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.'" Cnty. of

Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (quoting Daniels
v. Williams, 474 U.S. 327, 331 (1986)).   "The substantive due
process guarantee does not, however, serve as a means of
constitutionalizing tort law so as to 'impos[e] liability
whenever someone cloaked with state authority causes harm.'"
Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (quoting
Lewis, 523 U.S. at 848).

        To sustain her substantive due process claim, Kraft "must
show *both* that the [challenged] acts were so egregious as to
shock the conscience *and* that they deprived [her] of a protected
interest in life, liberty or property." Id. (emphasis in
original); see DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st
Cir. 2005).   The "shock the conscience" standard, though firmly
established, is difficult to define.   Actions that qualify as
"conscience-shocking" have been described as "truly irrational,"
"extreme and egregious," "truly outrageous, uncivilized, and
intolerable," and "stunning." González-Fuentes v. Molina, 607
F.3d 864, 880-81 (1st Cir. 2010).   Although the standard is
admittedly imprecise, it clearly "erects a high hurdle for
would-be claimants." Aguilar v. U.S. Immigration & Customs
Enforcement, 510 F.3d 1, 21 (1st Cir. 2007).   "Mere violations

of state law, even violations resulting from bad faith, do not
necessarily amount to [conscience-shocking behavior]."
DePoutot, 424 F.3d at 119. As the First Circuit explained in
Molina,

> [a] hallmark of successful challenges is an extreme
> lack of proportionality, as the test is primarily
> concerned with 'violations of personal rights . . . so
> severe . . . so disproportionate to the need
> presented, and . . . so inspired by malice or sadism
> rather than a merely careless or unwise excess of zeal
> that it amounted to a brutal and inhumane abuse of
> official power literally shocking to the conscience.'

607 F.3d at 881 (quoting Moran v. Clarke, 296 F.3d 638, 647 (8th
Cir. 2002) (en banc)).

Cases that have found state action egregious enough to be
considered conscience-shocking have generally involved highly
intrusive physical acts. See, e.g., Rochin v. California, 342
U.S. 165, 172 (1952) (obtaining evidence by pumping a
defendant's stomach against his will shocked the conscience);
Harrington v. Almy, 977 F.2d 37, 43-44 (1st Cir. 1992)
(requiring a police officer charged with child abuse to take a
highly intrusive physical test of sexual arousal as a condition
of his reinstatement could constitute conscience-shocking
conduct); Garcia v. Miera, 817 F.2d 650, 655 (10th Cir. 1987)
(corporal punishment of students may shock the conscience if the

14

resulting injury is "so severe" and "disproportionate" as to
constitute "a brutal and inhumane abuse of official power").

Acknowledging that substantive due process violations
generally involve physical intrusions, the First Circuit has
"left open the possibility that verbal or other less physical
harassment . . . might rise to a conscience-shocking level."
Cruz-Erazo v. Rivera-Montañez, 212 F.3d 617, 622 (1st Cir.
2000). A review of case law involving non-physical conduct,
however, illustrates that the threshold for establishing the
requisite abuse of government power is high.  See, e.g., id. at
622-23 (holding that months of harassment by police officers,
which included threats of physical violence, insults, and the
filing of unjustified charges, did not rise to the level of
conduct that shocks the conscience); Pittsley v. Warish, 927
F.2d 3, 7 (1st Cir. 1991) (concluding that police conduct was
"despicable and wrongful," but not conscience-shocking, where
police officers repeatedly threatened to kill plaintiff and once
threatened plaintiff's children with never seeing their father
again); Phelps v. Bracy, Civ. Action No. 06-40090-GAO, 2007 WL
2872458, at *3 (D. Mass. Sept. 27, 2007) (allegations that a
corrections officer threatened, yelled at, swore at, physically

15

intimidated, and appeared to intend imminent harm to a civilly committed person were insufficient to shock the conscience).

Here, Kraft contends that Mayer unlawfully interfered with Kraft's liberty interest in her good name and reputation by terminating her employment in retaliation for her MISA complaint against him.  In addition to Mayer's retaliatory animus, Kraft contends that defendants engaged in "conscience-shocking" behavior by: (1) placing Birmingham, UNH Special Counsel, "under cover to pose as an intermediary to deal with Kraft" after Kraft relocated her office to Kingbury Hall; and (2) "set[ting] in motion a high level team of administrators to ignore her claim of hostile environment and retaliation while planning to accommodate Mayer, the source of the hostile work environment and retaliation."   Pl.'s Obj. to M. for Summ. J., Doc. No. 26-1, at 13.

In light of the high hurdle that the applicable standard imposes, Kraft has produced insufficient evidence to permit a reasonable factfinder to conclude that defendants' conduct was so offensive and egregious as to shock the conscience.  Even assuming that Kraft's termination resulted from Mayer's retaliatory animus and that other UNH administrators condoned

the retaliatory termination, their bad faith motivation is insufficient to amount to conscience-shocking behavior.  See, e.g., Maymí v. P.R. Ports Auth., 515 F.3d 20, 30 (1st Cir. 2008) (public employee's removal from trust position in a state administrative agency and reinstatement to a lower-level position with reduced salary and diminished responsibilities did not shock conscience even if it resulted from a personal vendetta); Chakrabarti v. Cohen, 31 F.3d 1, 6 (1st Cir. 1994) (defendants' conduct in taking negative personnel actions that led to nonrenewal of psychiatrist's clinical privileges at a hospital allegedly due to his criticism of the hospital merger and of the head of his department did not shock the conscience); Santiago de Castro v. Morales Medina, 943 F.2d 129, 131-32 (1st Cir. 1991) (verbal harassment by a supervisor, which included berating plaintiff in presence of her students and defaming her to her colleagues, was insufficient to shock the conscience); Concepcion v. Municipality of Gurabo, 558 F. Supp. 2d 149, 160-61 (D.P.R. 2007) (plaintiffs' claim that they were subjected to adverse employment actions, including termination, as a result of political discrimination was insufficient to constitute conscience-shocking behavior); Painter v. Campbell Cnty. Bd. of

17

Educ., 417 F. Supp. 2d 854, 864 (E.D. Ky. 2006) (elementary
school principal's demotion to teaching position at another
school in retaliation for voicing opposition to proposed closure
of her school did not shock the conscience).

Moreover, Kraft's allegations that UNH administrators
ignored her hostile work environment complaints and posted
Birmingham as an intermediary between Mayer and Kraft without
disclosing her role as Special Counsel, do not describe
conscience-shocking behavior.  Even if I assume that UNH
administrators "intentionally or recklessly caused injury to the
plaintiff by abusing or misusing government power," Kraft has
failed to "demonstrate a degree of outrageousness and a
magnitude of potential or actual harm that is truly conscience
shocking."  Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995).

Kraft's Section 1983 claim fails even if I assume that her
substantive due process claim is subject to the less demanding
"arbitrary and capricious" standard that the First Circuit used
in evaluating substantive due process claims by tenured teachers
before the Supreme Court adopted the shock the conscience
standard.  See Newman v. Burgin, 930 F.2d 955, 963 (1st Cir.
1991); Newman v. Mass., 884 F.2d 19, 25 (1st Cir. 1989).  A

18

decision affecting a tenured teacher's employment status is arbitrary and capricious under this test "if the stated reason for the action was 'trivial, or is unrelated to the education process . . . or is wholly unsupported by a basis in fact.'" Newman, 884 F.3d at 24 (quoting McEnteggart v. Cataldo, 451 F.2d 1109, 1111 (1st Cir. 1971)). "[W]here [, however,] *stated* reasons adequately support an adverse personnel action, that action is not 'arbitrary,' whether or not a plaintiff might demonstrate a further 'real' *unstated* and arbitrary reason for the action." Burgin, 930 F.2d at 963 (emphasis in original).

Here, defendants have articulated an ostensibly legitimate reason for terminating Kraft's employment that is supported by facts in the record: her funding was terminated due to inadequate performance and a failure to propose research consistent with the terms of the grant supporting her position. Her undisputed failure to complete and submit for publication two of the three papers required under the September 2008 and March 2009 agreements at least arguably shows that her performance was inadequate. Therefore, even if Kraft could show that retaliatory animus was a moving reason behind her termination, the adequacy of the stated reason for her

19

termination precludes a substantive due process violation under the less demanding arbitrary and capricious standard.  See Burgin, 930 F.2d at 963.

Because defendants' conduct was not conscience-shocking, nor even arbitrary and capricious, I need not determine whether Kraft had a protected liberty interest in her good name and reputation.  Her substantive due process claim fails as a matter of law.

**B.   Kraft's State Law Claims**

In addition to her Section 1983 claim, Kraft also asserts four state law claims.  Having disposed of the only federal law claim in this action, I must determine whether to exercise supplemental jurisdiction over the remaining state law claims.  See 28 U.S.C. § 1367(c)(3); see also Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) (district court may decline jurisdiction after dismissing all claims over which it has original jurisdiction).  In making this determination, I must engage in a "pragmatic and case-specific evaluation" of a variety of relevant factors, including fairness, convenience, judicial economy, and comity.  Camelio, 137 F.3d at 672.

The Supreme Court has recognized that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); see Camelio, 137 F.3d at 672.  Here, the relevant factors weigh in favor of declining supplemental jurisdiction.

In terms of convenience and fairness to the parties, the fact that Kraft chose to file her suit in state court is an important consideration.  Defendants removed the case to federal court, thereby denying Kraft her choice of forum.  Now that I have dismissed the only federal law claim, fairness weighs in favor of allowing Kraft to litigate the remaining claims in state court, the forum she initially chose.  See Trask v. Kasenetz, 818 F. Supp. 39, 45 (E.D.N.Y. 1993) (remanding to state court after the dismissal of federal claims based on the "underlying logic" of protecting plaintiff's choice of forum).

Also relevant is the fact that a remand would not unfairly prejudice the parties.  Although discovery has been completed, there is no reason why the discovered materials cannot be used in state court litigation.  Cf. Redondo Constr. Corp. v.

21

Izquierdo, 662 F.3d 42, 49 (1st Cir. 2011) (remand imposed a significant burden where parties would have to either translate the documents and testimony taken in English or redo extensive discovery in Spanish because state courts in Puerto Rico operate in Spanish, whereas the district court proceedings are conducted in English).

Considerations of judicial economy similarly support remanding the case.  Although the case has been pending in federal court for some time, this court has not devoted substantial resources to it.  In fact, defendants' motion for summary judgment is the first dispositive motion the court has been asked to entertain.  Therefore, the court has not developed expertise in the case that would result in economies in continued federal litigation.

Lastly, comity interests are advanced by allowing a state court to resolve Kraft's remaining claims.  In addition to the general principle that "[n]eedless decisions of state law should be avoided [] as a matter of comity," United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966), the First Circuit has observed that "there is special reason why state judges should referee disagreements about whether and when state or local

officials may be fired." Flynn v. City of Boston, 140 F.3d 42, 48 (1st Cir. 1998); see Martineau v. Kurland, 36 F. Supp. 2d 39, 45-46 (D. Mass 1999) (citing Flynn's "special reason" rationale in declining to exercise supplemental jurisdiction over state law claims involving termination of employment of a nurse practitioner who had worked for a municipality).

Consideration of comity is all the more relevant in a case like this, where it is by no means clear that all of the state law claims are without merit.  See Coe v. Cnty. of Cook, 162 F.3d 491, 496 (7th Cir. 1998)) ("[W]hen a state-law claim is clearly without merit, it invades no state interest . . . for the federal court to dismiss the claim on the merits rather than invite a further, and futile, round of litigation in the state courts.").  Therefore, based on the balance of relevant factors, I decline to exercise supplemental jurisdiction over Kraft's state law claims.

## IV.  CONCLUSION

For the aforementioned reasons, I grant defendants' motion for summary judgment (Doc. No. 24) on Kraft's Section 1983 claim.  Pursuant to 28 U.S.C. § 1367(c), I remand Kraft's

supplemental state law claims to state court.[4]  The clerk shall enter judgment accordingly and close the case.

     SO ORDERED.


                       /s/ Paul Barbadoro_____
                       Paul Barbadoro
                       United States District Judge

January 25, 2012


cc:  Paul McEachern, Esq.
      Martha Van Oot, Esq.

---

[4] In light of my decision to grant in part defendants' motion for summary judgment, I deny as moot their motion to strike Kraft's objection to that motion (Doc. No. 37).  Although Kraft failed to include a statement of facts in her objection, as required by Local Rule 7.2(b), I construed the facts in the light most favorable to Kraft in deciding the motion for summary judgment. Similarly, I deny as moot defendants' motion to exclude Christian de Moustier's expert testimony (Doc. No. 47), their motion for leave to reply to Kraft's objection to the exclusion of that testimony (Doc. No. 62), and their motions in limine to exclude or limit evidence (Doc. Nos. 53, 54, 55).